DECISION AND JOURNAL ENTRY
These causes were heard upon the records in the trial court. Each error assigned has been reviewed and the following disposition is made:
The Juvenile Division of the Summit County Court of Common Pleas granted permanent custody of Cheyenne Moore ("Cheyenne") and Leslie Edwards ("Leslie") to the Summit County Children's Services Board, and terminated the parental rights of their mother, Michelle Moore ("Moore"), and their father, Leslie Edwards ("Edwards"). Moore and Edwards have appealed from this decision.
Moore has assigned fourteen errors by the trial court, and Edwards has assigned an additional three. Many of these assigned errors are repetitive, and Moore herself has grouped three of them together for argument. For ease in addressing them, the errors have been consolidated as follows: the trial court erred by (1) failing to timely appoint counsel; (2) overruling the magistrate's decision to place the children in long term foster care; (3) failing to remand the case to the magistrate for the second evidentiary hearing; (4) failing to identify the code sections which led to granting permanent custody to CSB; (5) finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent and that it was in the children's best interest to grant permanent custody to CSB; (6) abusing its discretion on evidentiary rulings, in violation of Moore's due process rights.[1] In addition, Moore has asserted that her trial counsel was constitutionally ineffective.
 I A. Placement History
On July 26, 1995, Moore and Edwards were arrested for drug trafficking. In September, Moore pleaded guilty to two counts of aggravated trafficking, and was sentenced to two one year sentences, to be served consecutively. In February 1996, in connection with an unrelated incident, Moore pleaded guilty to, and was convicted of, aggravated assault with a physical harm specification. As a result, she was sentenced to an indeterminate term of one and one half to five years, to be served consecutively to the sentence for drug trafficking. In September 1995 Edwards pleaded guilty to, and was convicted of, aggravated trafficking and was sentenced to two years. On July 19, 1996, Edwards pleaded guilty to, and was convicted of, aggravated assault with a physical harm specification for charges arising out of an unrelated incident. His three to five year sentence for this conviction was suspended, and he was placed on probation for two years.
As a result of Moore's and Edwards' incarceration, Summit County Children Services Board ("CSB") was granted temporary custody of their children, Cheyenne (d.o.b. 6/15/93) and Leslie (d.o.b. 5/1/95). Initially, the children were placed with Vernita Edwards, their paternal aunt. Sometime in August or September they were moved to the home of another paternal relative, Frances Edwards. In October 1995 the children were removed from her home, and were placed in foster home of Tracy Livingston. In December, when Livingston had a high risk pregnancy, the children were placed in the foster home of Dawn Johnson.
On January 19, 1996, the children were placed temporarily with their paternal grandmother Ruth Edwards ("grandmother"). On July 26, 1996, CSB's motion that legal custody to be given to the children's grandmother was granted. During the period when Cheyenne and Leslie were in the legal custody of their grandmother they spent most weeks at the home of Stacy Smith, going "home" only on weekends. The children were removed from their grandmother's home on December 14, 1996, and on December 16, 1996, CSB filed a complaint alleging that the girls were neglected and dependent children. The children were placed in the temporary foster home of Mark and Belinda Drew for thirty days. On January 15, 1997, the children were returned to the foster home of Livingston. CSB was granted temporary custody on February 27, 1997, at which time the children were adjudicated neglected and dependent. Because Livingston experienced health problems, the children were moved on October 1, 1997, to the home of Diane Knapp. During this period, CSB moved for permanent custody. The matter was referred to a magistrate, who held a hearing in November 1997. Following objections by CSB, the trial court held an additional hearing in April 1998. The children, at the time of the April hearing, were living with the Knapps, who wish to adopt them.
 B. Emotional and Therapeutic needs of Children
When the children were removed from the legal custody of Ruth Edwards, both had severe emotional problems. Leslie was described, at age two, as "practically non-verbal" and as communicating by "grunt[ing], whin[ing], and us[ing] a few scattered words." She was resistant to being bathed, and to being touched around her private areas.[2] She had severe problems associated with food, and the sight or mention of food would almost always result in an emotional display. As an example, she began sobbing at one point because a man in the car next to the car in which she was riding was eating a sandwich. She would regularly twist her hair, pull it out in chunks, and eat it.
At age four, Cheyenne was described as a "highly aggressive child" who would bite, kick, hit, and spit at her foster mother when she became angry or frustrated. She also displayed these behaviors toward other children. Her temper tantrums were extreme, and once wound up, she had difficulty calming herself down or changing her behavior. Cheyenne also had extreme problems around food. She indiscriminately ate any food that was available, to the point of eating so much that it resulted in vomiting and diarrhea. She snuck out of her room in the evenings to find food and would eat "non-nutritive substances," such as coffee grounds, if that was all she found. She hoarded food, and hid it throughout her foster home. For Cheyenne, particularly, transitions between homes or caregivers exacerbated her problems.
Both girls have improved since they were placed with the Knapps. Although neither is yet permitted in the kitchen during food preparation, Cheyenne's emotional reaction to food has decreased now that she can count on being fed. She also now expresses some food preferences, and has at times even left food uneaten. This improvement is only apparent at home, and Cheyenne still cannot control her eating outside the foster home. Her temper tantrums are less extreme and frequent, and she is less aggressive.
Leslie's reaction to food is still very emotional, but with careful structure her ability to cope with food has improved. She is pulling out, and eating, less of her hair. As her vocabulary has improved, she has begun to interact more with other people. She has also begun to display stubbornness and temper tantrums, an improvement because in the past she repressed most of her emotions. At times when transitions in her life were most frequent, she was more withdrawn, quiet, and reserved. It is expected that because of the severity of her problems, she will experience multiple regressions.
The psychologist who has been treating Cheyenne and Leslie recommended that Cheyenne remain "in a consistent and structured environment," and that "transitions and multiple environments be limited[.]" She recommended the same for Leslie, and indicated that "Leslie needs to develop trust of the environment and her caregiver which takes a great deal of time due to her past hurts[,]" and that "[f]urther upheavals and moves would only delay Leslie's ability to trust and bond to someone in a meaningful way."
 C. Bonds with Significant People
Both girls display ready, indiscriminate affection, but have difficulty forming meaningful bonds with caregivers. They have been making improvements in their current placement. Leslie has an attachment to Knapp, and Cheyenne has asked why her picture is not on the wall with the rest of the family. Both girls are bonded to each other. In fact, when permitted to sleep in the same bed Leslie's hair pulling diminishes greatly. The guardianad litem reported that, "The girls seem very comfortable in this family situation with the other siblings and grandparents."
At this point, neither Cheyenne nor Leslie is particularly bonded with Moore. The last time Cheyenne and Leslie lived with Moore was in July 1995, when Cheyenne was two years old, and Leslie was seven weeks old. Between July 1995 and June 1996, Cheyenne and Leslie visited with Moore on five occasions, for between thirty minutes and two hours.
Moore did try very hard to maintain the bond she had with her children. She sent cards and letters to them, she made presents for them, and arranged to have presents purchased for them. Most of the cards, letters, and presents were not delivered, on the combined recommendation of the children's psychologist and CSB. At the time of the April 1998 hearing, CSB was holding approximately six containers of undelivered items. When prison visitations were stopped because legal custody had been granted to the children's grandmother, Moore communicated with both CSB and with the judge of the Juvenile Court in an attempt to have them restarted. According to the guardian ad litem, Cheyenne at least remembers Moore.
The children are not bonded at all with their father. Edwards vanished from their lives at the same time that Moore did. The children did not visit with Edwards while he was in prison. After he was released in the second half of December 1996, he started visiting with them, perhaps as often as weekly. The visits were generally positive, but ended by June when he missed two visits in a row. At that time, CSB decided it was too traumatic for the children to be readied for a visit, transported to the site for visitation, and then not be able to see their father. In addition, Edwards was having difficulty in complying with other parts of his case plan which were designed to assist him in maintaining a drug and alcohol free life.
 D. The Report of the Guardian Ad Litem
The volunteer guardian ad litem recommended that an extended attempt be made to reunify Moore with her children. She described the problems the children had when CSB took temporary custody of them from their grandmother, and the progress that their current foster mother has made in resolving some of these problems. Much of the report focused on Moore, on her attempts to better herself while incarcerated, and on the barriers the guardian ad litem
perceived CSB to have placed in Moore's path. Although she noted the tremendous emotional upheaval in the children's lives and the problems that this has caused, the guardian ad litem did not explain how Moore's presence in their lives would serve to ease this upheaval or help remedy the emotional problems they now face. Her strongest assertion with respect to the children's best interest is that, "These children deserve a chance to be reunificated [sic] with their mother who cares for them."
 E. Permanent Placement with a Family Member
In June 1997 CSB began to consider placing Cheyenne and Leslie with Moore's aunt and uncle. Although they had never met the children before, Bill and Julie Markle drove to Akron several times from their home in West Virginia to begin a relationship with the children. In July 1997 Moore made a motion that her children be placed permanently with the Markles. In September 1997 an interstate home placement evaluation was initiated.
In October 1997 an allegation of sexual abuse was made against the Markles. Although the allegation was ultimately discounted, the Markles withdrew from actively pursuing custody of the children shortly thereafter.[3] Their motion to have the children placed with them had not been addressed by the court at the time of the April hearing. The Markles were present at the April hearing. They expressed their frustration at what they perceived as active opposition by CSB to placing the children with them. The Markles expressed a continued willingness to welcome the children into their home.
 II A. Failure to Make a Timely Appointment of Counsel
Indigent parents are entitled to appointed counsel at parental termination proceedings. In re Baby Girl Baxter (1985),17 Ohio St.3d 229, 232, citing State ex rel. Heller v. Miller
(1980), 61 Ohio St.2d 6, paragraph two of the syllabus. An indigent parent who is party to any Juvenile Court proceeding, including a temporary custody hearing, is also entitled to appointed counsel pursuant to R.C. 2151.352 and Juv.R. 4. Stateex rel. Asberry v. Payne (1998), 82 Ohio St.3d 44, 48. The United States Supreme Court has determined that there is no absolute constitutional right to appointed counsel with respect to matters of custody; rather it is a matter to be determined in the first instance by the trial court and is subject to appellate review.Lassiter v. Durham Cty. Dept. of Social Serv. (1981),452 U.S. 18, 33, 68 L.Ed.2d 640, 654. Although it is not clear whether the right to appointed counsel for proceedings related to the termination of parental rights is guaranteed by the Ohio Constitution,[4] the Supreme Court of Ohio has determined that the right to appointed counsel at temporary custody hearings is not. Beard v. Williams Cty. Dept. ofSocial Services (1984), 12 Ohio St.3d 40, 41.
Here, the children were initially adjudicated dependent on September 18, 1995. Moore was not present or represented by counsel at that adjudication. On July 26, 1996, the grandmother was granted legal custody of the children. Moore was not present or represented by counsel for that adjudication. On January 15, 1997, following the emergency removal of her children from their grandmother's custody, the court finally ordered that Moore be appointed counsel. Counsel was actually appointed on February 12, 1997. She was represented by counsel for the duration of the proceeding that resulted in termination of her parental rights.
The initial order finding the children to be dependent and neglected and granting temporary custody to CSB was a final appealable order. In re Murray (1990), 52 Ohio St.3d 155, syllabus. The order granting legal custody to the grandmother, pursuant to Juv.R. 34, was also a final appealable order. Id. at 159, fn. 2, citing In re Patterson
(1984), 16 Ohio App.3d 214,215. Moore was almost certainly entitled, by statute, to the assistance of counsel for proceedings that led to the initial judgments. Unfortunately, the time for an appeal from each of those judgments, when the lack of appointed counsel could properly have been raised, ended well before this appeal. In reSmith (1982), 7 Ohio App.3d 75, 77.
No matter how improper the failures to appoint counsel for the initial proceedings were, the Ohio Supreme Court has determined that failure to appoint counsel for a temporary custody proceeding is not an error of constitutional magnitude. Absent an error of that magnitude, the earlier judgments are now final and no challenges may be brought regarding the procedures that contributed to them.[5]
Moore was ultimately appointed counsel for the proceedings that terminated her parental rights, so the asserted error is not relevant to the judgment currently under appeal. Moore's first assignment of error is overruled.
Long Term Foster Care
 Once a child is adjudicated abused, neglected, or dependent, the court has a number of options for placement of the child. R.C. 2151.353(A). One of the options is long-term family foster care. R.C. 2151.353(A) (5). Although the particular placement is generally discretionary, the placement in long-term family foster care is not. The court may only place a child in long-term family foster care if:
 [A] public children services agency or private child placing agency requests the court to place the child in long-term family foster care and if the court finds, by clear and convincing evidence, that long-term foster care is in the best interest of the child and that one of the following exists:
 The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care;
 The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child * * * and the child retains a significant and positive relationship with a parent or relative;
 The child is sixteen years of age or older, has been counseled on the permanent placement options available to the chld, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing the child for independent living.
(Emphasis added.) R.C. 2151.353(A) (5).
There was no evidence that either Cheyenne or Leslie were "unable to function in a family-like setting and must remain in residential or institutional care" because of "physical, mental, or psychological problems or needs[.]" At the time of both dispositional hearings both girls were living in a foster family, and their physical and emotional problems were improving. The girls were not in residential or institutional care, and there was no indication that such a placement was contemplated.
No evidence was presented that Moore had significant physical, mental or psychological problems that made her incapable of caring for her children. The primary barrier to caring for her children at the time of the magistrate's hearing was her incarceration, which does not fall into the category of a significant physical, mental, or psychological problem.
In addition, while Cheyenne may have some memory of her mother, Leslie has no recollection of her since they have been separated since Leslie was seven weeks old. At the time of the hearing, neither child could be described has having a significant and positive relationship with Moore. Finally, both children are under the age of sixteen. R.C. 2151.313(A) (5) (c) is inapplicable to their situation.
Ignoring that the request for long term foster care did not come from CSB, and assuming, arguendo, that there was "substantial credible and competent testimony" that it was in the best interests of Cheyenne and Leslie to be placed in long-term family foster care, it was not within the discretion of the magistrate to make that placement. That option is only available in three limited situations. Cheyenne and Leslie did not fit into any of those situations. Because the magistrate did not have the discretion to place the children in long term foster care, it was not an abuse of discretion for the judge to reject that disposition.
Failure to Remand to the Magistrate for an Evidentiary Hearing
1. Abuse of Discretion
The process of terminating parental rights involves two phases, an adjudicatory phase and a dispositional phase. R.C.2151.35(A). When possible, the same judge or referee shall preside at both the adjudicatory and dispositional hearing. R.C.2151.35(B) (2) (a). The trial court must make the ultimate disposition, whether or not a matter of permanent custody is referred to a magistrate. Juv.R. 40(E) (4) (a). Once the magistrate's decision is issued, any party may make objections to the decision. Juv.R. 40(E) (3). In ruling on the objections, the trial court "may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter itself." Juv.R. 40(E) (4) (b).
Moore has argued that the trial court should have recommitted the matter to the magistrate for a second evidentiary and dispositional hearing, and has cited R.C. 2151.35(B) (2) (a) in support of that proposition. The cited statute indicates that, where possible, the same individual should hear the both the adjudicatory and dispositional phases of the termination proceeding. That was initially done, in this case. The same magistrate heard both phases, and issued a decision.
The separation about which Moore complains is not between the adjudicatory and dispositional phases, but between the magistrate's decision and final disposition of the matter. Trial court action on that decision was governed by Juv.R. 40, which we noted above gives the trial court wide latitude to act as it deems most appropriate. Rather than recommit the matter to the magistrate, the trial court undertook a limited evidentiary hearing to gather the additional evidence that it needed to ultimately dispose of the matter. This is consistent with the rules that govern court action on a magistrate's decision.
Had the trial court recommitted the matter to the magistrate, the magistrate would have held another evidentiary hearing and issued another decision. Either party could then have objected to the decision. The trial court would have been required to rule on those objections, before making a final disposition. Even after a second evidentiary hearing before the magistrate, it is possible that the trial court would still need additional evidence in order to make the final disposition. Given the complex nature of this case, the initial failure of the magistrate to gather all the information needed, and the potential that the process might need to be repeated several times, it was not unreasonable, arbitrary, or unconscionable for the trial court to decide to hear the matter itself. A decision that is not unreasonable, arbitrary, or unconscionable is not an abuse of discretion. See State v. Adams
(1980), 62 Ohio St.2d 151, 157-158. The trial court acted within the bounds of that discretion granted to it.
2. Due Process
In addition, Moore has asserted that the decision by the trial court to hold an evidentiary hearing itself, rather than recommit the matter to the magistrate was a violation of Moore's constitutional due process rights "to be heard in a meaningful manner." After reviewing five hundred fifty-eight pages of transcripts and fifteen multi-part exhibits, the trial court reached the conclusion that the magistrate's decision was incorrect. Although it had various options at that point, only two of them are debated here. As suggested by Moore, the court could have recommitted the matter to the magistrate. Instead, it chose to hear the matter itself.
To determine whether this was a violation of due process, we balance the interests of the state against the interests of the parents, in light of the risk that the procedure used will produce erroneous results. Mathews v. Eldridge (1976), 424 U.S. 319, 335,47 L.Ed.2d 18, 33. Here, the state has an interest in protecting Cheyenne and Leslie. Among other things, that interest includes resolving the uncertainty in their lives as quickly as possible and reaching a decision that is in their best interests. As earlier noted, the trial court must review whatever decision the magistrate reaches. Under the circumstances in this case, recommitting the matter to the magistrate might have involved considerable, and potentially repeated, delay.
Moore has an interest in preserving her relationship with her children. She has asserted that the interest includes having all the evidence heard by the magistrate. According to Moore, the magistrate is the court official most knowledgeable about the procedural and factual history of the case. She has specifically noted three concerns. First, the quantity of testimony and evidence would make it difficult for a secondary finder of fact to become completely familiar with the case. Next, the magistrate conducted "an in camera inspection of a pending and collateral neglect/abuse case involving the minor children's primary caretakers." Finally, the magistrate was able to observe the testimony of the witnesses firsthand.
The first and third concerns are related. With respect to the quantity of evidence, at the time that the court decided to hold a second evidentiary hearing it had already familiarized itself with the evidence previously gathered. Because of Moore's intense commitment to regaining custody of her children, and the vigorous opposition of CSB to anything less than permanent custody, it is almost certain that there would be objections to any subsequent magistrate's decision. Even if the trial court had it recommitted the matter to the magistrate for a second hearing, it would almost certainly have been necessary for the trial court to review all the evidence from that hearing in order to resolve these subsequent objections. The procedure the court followed made it more familiar with the evidence on which it was ultimately required to base its judgment. This is particularly true since the transcript ultimately consisted of 1419 pages of transcript, nearly two thirds of which the trial court heard directly.
As Moore has pointed out, the court did not automatically have the opportunity to directly observe the demeanor of the witnesses heard by the magistrate. As support for the proposition that this was a fatal mistake, Moore has cited cases that caution an appellate court against reversing factual findings by the lower courts. The circumstances are not analogous. An appellate court is restricted to reviewing the record. It never has the opportunity to observe witnesses first hand. Here, however, the trial court is specifically permitted to hear new evidence and to observe as few or as many of witnesses as it deems necessary to decide the matter. Juv.R. 40(E) (4) (b).
In this case, three of the eight witnesses who testified at the November 1997 hearing also testified at the April 1998 hearing, giving the trial judge an opportunity to judge the general credibility of those witnesses directly. One of those witnesses was the bearer of the most strongly negative testimony against Moore. Because the trial court was permitted to hear new evidence, was permitted to rehear part or all of the matter, and in this case actually heard additional testimony from three prior witnesses, the concern that the trial court would be unable to accurately judge witness credibility is minimal.
Finally, Moore's concern that the trial court is not intimately familiar with a collateral case is not an appropriate concern. What Moore has requested, in essence, is that the adjudication be recommitted to the magistrate so that the magistrate can use the knowledge she gained in an unrelated judicial proceeding to help her decide this case.[6] Although not labeled as such, what it appears Moore wants is for the magistrate to be able to take judicial notice of a distinct proceeding, the very practice she criticizes the trial court for using when it took judicial notice of the outcomes of two prior cases that actually involved Cheyenne and Leslie. As Moore has pointed out, this is forbidden. Diversified Mtge. Investors, Inc.v. Athens Cty. Bd of Revision (1982), 7 Ohio App.3d 157, 159.
The process utilized by the court furthered the strong interest of the state to move quickly to resolve the uncertainty in the lives of Cheyenne and Leslie in a way that served their best interests. Moore's interest in having a single individual hear all the evidence, as she has framed it, is related to ensuring that the decision maker is fully informed about the entire case. The trial court, not the magistrate, is the ultimate decision maker. The process used, if anything, permitted the trial court to be more informed than had it merely reviewed the evidence gathered by the magistrate.
The risk that the procedure selected by the trial court will produce erroneous results is minimal. The trial court reviewed all the testimony. Although it did not observe the witnesses during the first hearing, it did observe the witnesses during the second hearing. The majority of the testimony occurred during the second hearing. That later observation included three of the eight witnesses who testified at the November hearing. If the trial court found matters about which there were conflicts, it could have requested additional testimony on the matter, at which time it could have directly judged the credibility of the competing witnesses.
The decision of the trial court to hear the evidence directly, rather than to remit the matter to the magistrate, was not a violation of Moore's due process rights, nor was it an abuse of discretion. Moore's third assignment of error is overruled.
 D. Findings of Facts and Conclusions of Law
Moore alleges that "[t]he trial court [did not] designat[e] which code sections if [sic] found applicable[.]" Although it is true that the trial court did not designate its findings by citation, it did make the statutory findings.
The trial court found that:
 G. Father Leslie Edwards has demonstrated a lack of commitment toward the children Cheyenne Moore and Leslie
 Edwards by failing to regularly support, visit, or communicate with the children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children[.]
This is nearly a verbatim recitation of R.C. 2151.414(E) (4), which provides that:
 The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
In like manner, finding "I" is a nearly verbatim recitation of R.C. 2151.414(E) (9). The only differences are the substitution of "Father Leslie Edwards" for "The parent" and "children" for "child," and the elimination of the irrelevant disjunctive clause "physical, emotional, or sexual abuse." Finding "J" is a nearly verbatim recitation of R.C. 2151.414(E) (10). The court substituted the actual parties for the generic "parent" and "child" in the statute, omitted a disjunctive clause that did not apply, and omitted a direction to the court. Assuming, arguendo, that the statutory findings must be articulated, the court appropriately did so. It is not necessary for the trial court to provide a formal citation to the statute when the court recites the language of the statute verbatim, with the exception of substituting appropriate party names, changing "child" to "children," and omitting irrelevant disjunctive portions of the statute.
Moore's fourteenth assignment of error is overruled.
 E. Statutory Analysis
In order to grant permanent custody to CSB the court must find, by clear and convincing evidence, that the children "cannot be placed with either of [their] parents with a reasonable time or should not be placed with [their] parents[.]" R.C.2151.414(B) (1). Under some circumstances, the court must also find that "the public children services agency * * * has made reasonable efforts to * * * eliminate the continued removal of the child[ren] from [their] home[.]" R.C. 2151.419(A). In addition, the court must find by clear and convincing evidence that it is in the best interests of the children that permanent custody be granted to CSB.
1. Placement with Parents
The trial court must examine all relevant evidence and determine whether:
 one or more of the following exist as to as to each of the child[ren]'s parents[:]
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
 (9) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect;
 (10) The parent has committed abuse as described in section 2151.031 * * * of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety;
* * *.
(Emphasis added.) R.C. 2151.414(E). When the trial court finds that at least one of the above factors exists as to each of the child's parents it "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" Id.
The trial court specifically found that the tenth factor applied to both Moore and Edwards, and in addition that the fourth and ninth factors applied to Edwards.[7] Because of this, it entered the mandatory finding that the children cannot be placed with either parent within a reasonable time and that they should not be placed with either parent.
Both Moore and Edwards have challenged the ultimate finding. Moore has argued that R.C. 2151.414(E) (1), (4), (7), and (9) do not apply against her. The substance of each party's argument is that some of the R.C. 2151.414(E) factors do not apply to one or the other of them. Moore, in particular, has argued that R.C.2151.414(1), (4), (7), and (9) do not apply to her. The trial court found that R.C. 2151.414(E) (10) applied to Moore. She has not argued that the court was incorrect in finding that R.C.2151.414(E) (10) existed, as to her, because she "caused or allowed the children Cheyenne Moore and/or Leslie Edwards to suffer neglect as described in section 2151.03 of the Revised Code and the likelihood of recurrence of the neglect makes the children's placement with the parents a threat to the children's safety[.]"[8]
The factors in R.C. 2151.414(E) are not balanced against one another. The existence, with respect to each parent, of any of the factors mandates entry of a finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E). Even accepting her assertions that the first, fourth, seventh, and ninth factors do not apply against her, the unchallenged finding by the court that the tenth factor did apply to her made the court's ultimate finding mandatory, absent a finding that none of the factors applied to Edwards.
The trial court found that, among others, the ninth factor existed as to Leslie Edwards because, "Leslie Edwards is unwilling to provide food, clothing, shelter, and other basic necessities for the children or to prevent the children from suffering physical, emotional, or mental neglect[.]" See R.C.2151.414(E) (9). Edwards included the relevant finding in a list of seven conclusions which he "avers were not supported by the facts." He has made no attempt to demonstrate why the facts do not support the finding, or would logically lead to a different conclusion.[9] His primary response to the court's finding was to assert that in order to grant permanent custody to CSB the trial court must find that "the children cannot be returned to either parent within a reasonable time[,]" and that he believes the children can and should be returned to Moore.
The trial court found that one or more of the R.C.2151.414(E) factors existed as to each parent. Neither party proffered an argument as to why these findings were not supported by the facts. Despite the lack of argument proffered by either party, we have reviewed the evidence and find that, at a minimum, it clearly and convincingly supports finding that R.C.2151.414(E) (10) exists as to Moore and that R.C. 2151.414(E) (9) exists as to Edwards. Because of this, no matter how many of the other factors did not exist, the court was compelled to find that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent.
R.C. 2151.419 Determination
 In addition to her general arguments that factors one, four, seven and nine do not apply against her, Moore has asserted that, pursuant to R.C. 2151.414(E) (1) and R.C. 2151.419, CSB had an "affirmative obligation * * * to make a reasonable [sic] diligent effort at family reunification before moving for permanent custody." Although the former
 R.C. 2151.414 did require a diligent attempt at reunification, the current version does not. Compare R.C. 2151.414(E) (1) with the prior R.C. 2151.414(A) (1) (amended effective Jan. 1, 1989). R.C. 2151.414(E) (1) provides that if the agency diligently works with the parents, once the children are placed outside the home, and the parents are still unable to remedy the circumstances that led to the placement outside the home then the court must find that returning the children to the parents is inappropriate. See id. While the failure of parents to remedy their shortcomings in the face of diligent efforts by CSB may result in the initial finding necessary to terminate parental rights, diligent efforts to reunify the family are not directly mandated by R.C. 2151.414(E) (1).
Under certain circumstances, R.C. 2151.419 requires the trial court to determine whether the public service agency has made reasonable efforts to keep the family together. By its plain language, the statute requires that the determination be made at any hearing held "pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314 [2151.31.4], 2151.33, or 2151.353 [2151.35.3] of the Revised Code at which the court removes a child from his home or continues the removal of a child from his home[.]" R.C. 2151.419(A). The motion for permanent custody was made pursuant to R.C. 2151.413. When a motion for permanent custody is made pursuant to R.C. 2151.413, the hearing is conducted "in accordance with section 2151.35[.]" R.C.2151.414(A) (1). Although R.C. 2151.35 does refer to the "proper disposition to be made under section 2151.353[,]" it also directs that the "court shall proceed [with the dispositional hearing] in accordance with division (B) of" R.C. 2151.35. R.C. 2151.35(A). R.C. 2151.35 is not one of the hearing proceedings governed by R.C. 2151.419. Because of this, R.C. 2151.419 does not directly apply to motions for permanent custody made pursuant to R.C.2151.413. See In re Andrew Guisinger (May 31, 1994), Stark App. No. CA-9478, unreported.
The distinction between a complaint requesting permanent custody pursuant to R.C. 2151.28, which explicitly requires an R.C. 2151.419 determination, and a motion requesting permanent custody pursuant to R.C. 2151.413, which does not, is that R.C.2151.413 governs a second custody disposition for the same children. By the time an R.C. 2151.413 motion is made, the court has already made an initial disposition. R.C. 2151.413. It was required at the time of the initial adjudication and disposition to determine whether reasonable efforts were made to prevent the removal, or continued removal, of the child from the home. R.C.2151.353(H); R.C. 2151.419.
The circumstances in this case are somewhat unique. Here, Cheyenne and Leslie were taken from the custody of their grandmother rather than their parents. In a similar case, Kwanza Lee Stevens was living with his maternal aunt because both parents were in prison. While she had custody of him, the aunt severely abused him. Following the removal of Stevens' from his aunt's home, CSB was granted temporary custody at which time the court found that it had made reasonable reunification attempts with the maternal aunt. The adjudication and dispositional judgment, and subsequent case plans, were written in a manner that clearly referred to reunification attempts with Stevens' maternal aunt. After the subsequent R.C. 2151.413 permanent custody hearing, Stevens' mother appealed because there had not been reasonable reunification attempts with her. The Second Appellate District held that a determination that the R.C. 2151.419 reunification attempt must be made with respect to the parents at some point during the process of terminating parental rights. In re KwanzaLee Stevens (July 16, 1993), Montgomery App. No. 13523, unreported. It based that holding on the general principles underlying Chapter 2151 of the Ohio Revised Code. Id. Based on that reasoning, if the determination was not made with respect to the parents at the initial adjudication, it must be made at the time of the permanent custody decision. Id.
In this case, unlike in Stevens, on February 27, 1997, the trial court actually made the R.C. 2151.419 determination with respect to Moore and Edwards, finding that that "Children Services Board has made reasonable efforts to prevent the continued removal of the minor children from their parents' custody." Without adopting the Second Appellate District's judicial enlargement of R.C. 2151.419, see In re Lawson/Reid Children (April 18, 1997), Clark App. No. 96CA0010, unreported, we note that it is inapplicable here. The enlargement adopted by the Second Appellate District only requires that the determination be made when granting permanent custody to CSB if it was not made at an earlier stage. See In re Andrew Efaw (April 21, 1998), Athens App. No. 97CA49, unreported. The determination was made against Moore and Edwards when temporary custody of their children was granted to CSB, the time the statute clearly required that it be made. Because Moore and Edwards did not provide this court with a transcript of the hearing, which led to that trial court determination, there is no means of reviewing whether the evidence before the trial court supported the decision. Because the record of the trial court is silent, as to this hearing, this court must presume that the February 27, 1997 decision by the trial court was properly made. See Makranczy v. Gelfand (1924), 109 Ohio St. 325, paragraph one of the syllabus.
3. Best Interests of the Children
To find that it is in the best interests of the children that permanent custody be granted to CSB, the trial court must consider all relevant factors, including the following statutory factors:
 The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
The custodial history of the child;
 The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
R.C. 2151.414(D). This determination must be supported by clear and convincing evidence.
This stage of the inquiry is essentially one in which the children's present circumstances and needs are assessed. It is an evaluation of what is in the children's best interest from this point forward, without placing blame or responsibility for how they arrived at this point. The focus in this part of the inquiry is on the best interest of the children, and the court must not consider the effect that the granting of permanent custody to CSB will have on the mother. In re Wise (1994), 96 Ohio App.3d 619,624. From this, it is clear that no matter how much effort Moore has put into preparing herself for active participation in her children's lives again, that effort does not factor into this consideration unless the court finds that her children would be better off if she were to remain an active part of their lives.
Leslie and Cheyenne have problems forming long term, trusting relationships with those around them. They are bonded to each other, and are beginning to form bonds with their current foster family. Despite Moore's best efforts at maintaining a relationship with her children, that relationship has not been maintained. Leslie has no attachment to Moore, and Cheyenne has minimal or no bond with Moore. Neither child has a bond with Edwards or with the Markles.
The guardian ad litem clearly stated that Moore should be given a chance to reunify with her children. She cited all the positive steps Moore took while in prison in order to be prepared to care for her children on release. It is clear from the report that the guardian ad litem believes that Moore has not been given a fair chance by CSB. Although it details the commitment Moore has made to reunifying with her family, aside from a few conclusory statements the report is notably silent on what would be best for the children. It observes the children's positive adjustment to living with the Knapps, stressing the structure that assists the Knapps in helping the girls to overcome the chaos in their lives prior to their placement with the Knapps.
The guardian ad litem report notes, without any support, that "[t]hese children deserve a chance to be reunificated [sic] with their mother who cares for them." Without any evaluation of how, or whether, the reintroduction of the children to their mother would be beneficial to them, after an absence of nearly all of Leslie's life and nearly half of Cheyenne's, the court appropriately placed little weight on the guardian ad litem's report. As written, the report was little more than an advocacy brief on behalf of Moore.
With respect to Leslie's and Cheyenne's custodial history, the children lived in at least nine homes between July 1995 and May 1998, staying an average of a little over four months in each placement. Moore argues that there were at least twelve placements during this period. Because this stage of the evaluation is designed to assess the children's current circumstances and what would be best for them from now on, regardless of how they got here, Moore's argument that there were at least twelve placements and that all except the first were the fault of CSB does not support her contention that the children should be moved yet again. Who is responsible for the children's multiple transitions is irrelevant. The impact of being moved so often on the children and their need for stability is what is crucial here. The guardian ad litem and the children's counselor both report that Leslie and Cheyenne need stability in their lives. The counselor reports that the children's emotional difficulties increase when there are more transitions in their lives, whether those transitions are as major as changing caregivers or as minor as an afternoon visitation with their father. Moore's and Edward's requests that they be reintroduced to the children would inject more transitions and instability into the children's lives.
As of the date of the hearing, although Moore's commitment to working to reunite with her children was evident, her ability to do so was far from certain. In the few years before her incarceration, Moore was convicted of at least three other crimes. She was unable to comply with the conditions of probation, which resulted in numerous additional convictions.[10] This pattern of difficulty in complying with restrictions on her behavior is an indication that it will probably be difficult or impossible for her to provide the structure her own children desperately need. She has struggled with drug and alcohol addiction, perhaps as recently as during her pregnancy with Leslie. Addiction is a difficult battle to fight and one which many individuals lose.
While incarcerated, Moore took approximately twenty-one parenting classes. While the effort was indeed admirable, she could not demonstrate what she had learned from those classes. When asked questions in court about specific things she had learned, she responded in generalities. One exchange, fairly typical of the others, follows:
 * * * I'd like you to give your insight of what you took out of that parenting class.
 That when you are a parent, you're a parent. You have a very big responsibility and a deep commitment to your children. Your — they learn everything, you know, that you do. I get a lot out of his classes. I — you know,
 I never miss any of his classes. Like I said, the three years I've been in Cleveland, I never miss his classes.
 He brings a lot of speakers in. Juvenile Court judges from Cleveland, caseworkers, and you know, we talk to these people. He brings in — God, just it's a lot of guest speakers, you know, to try to — like just because you're incarcerated, you don't stop being a parent.
 You're still a parent. No matter where you are, if you gave birth to those kids, those are your kids, you know, and he offers a lot of alternatives. I mean, he's got — his outlook on parenting — I can't explain it. I'm nervous.
Okay.
 He gives us a lot of tools, you know. I mean, I got a file this thick from his classes.
With children who are emotionally intact, this might have been sufficient. Leslie and Cheyenne, however, are intensely needy children. They need a highly structured environment, a part of which involves a caregiver who can learn very specific skills and use them consistently. While Moore may be able to do so, her inability to articulate any specific information that she acquired from any of these classes makes that ability far from certain.
To subject the children to yet another transitions, and yet another caregiver, without some reasonable certainty that the transition will be a lasting one is not in Leslie's and Cheyenne's best interest.
CSB explored the possibility of placing the children with Moore's aunt and uncle for adoption. Moore contends that CSB did so only half-heartedly, placing every conceivable roadblock in their path. Whether that exploration was half-hearted or diligent, by the April hearing Cheyenne and Leslie had not had contact with the Markles for seven months. Even though the Markles expressed a continuing willingness to adopt Cheyenne and Leslie, such a placement now would be essentially another new transition. Leslie and Cheyenne are currently placed in a home with foster parents who have expressed a desire to adopt them. To place them with the Markles would involve months of transition and, ultimately, would involve severing ties with nearly everyone Leslie and Cheyenne currently know in order to move with the Markles to West Virginia. The children once began a relationship with the Markles, only to have them abruptly vanish from their lives. It would likely take a significant period of time before Leslie and Cheyenne could trust that the Markles would not vanish again.
Although adoption by a relative often offers a legally secure permanent placement other than placement with CSB, in this case, the detriment of what would be the most severe transition they have yet experienced outweighs any benefit that permanent placement with a relative might bring. This is especially true in light of the children's current stable placement in which there is a great likelihood that the home could become a permanent one.
The responsibility of the trial court is to determine what is in Leslie's and Cheyenne's best interest. While it may seem unfair to discount Moore's heroic efforts while incarcerated to draw attention to her children's plight and to better herself, at this stage the state is not permitted to consider the impact of severing the parent-child relationship on Moore. In this case, the court found that Moore's actions permitted her children to be neglected, by virtue of being left without adequate parental care, and that it occurred under circumstances that were extremely serious or were likely to recur. Because this finding mandates the ultimate finding that her children cannot be placed with her within a reasonable period of time or should not be placed with her, the remainder of the inquiry focuses solely on what her children need. In this case, neither Moore nor Edwards has a significant relationship with either child. In contrast, both children have begun to trust and to bond with their foster family. The guardian ad litem's report inappropriately focused on Moore's actions and needs rather than the children's and provided little guidance as to what would be in the best interest of the children or what the desires of the children were.
The children have moved, and essentially changed parents and siblings, an average of once every four and a half months. This changing of families and houses has been a part of Leslie's life for nearly her entire life, and a part of Cheyenne's life for nearly half of her life. The children desperately need permanency in their lives. The possibility of placement with the Markles, while potentially permanent, would involve yet another transition. Because the Markles have only visited with Cheyenne and Leslie, and have not spent extended time with them, they are less likely to be able to provide permanency than the Knapps. Although the Knapps are not biologically related to the children, they clearly love them and have demonstrated the willingness and ability to care for them in a consistent and structured manner.
The trial court correctly determined, by clear and convincing evidence, that it was in the best interest of Cheyenne and Leslie that CSB be granted permanent custody of them. It also correctly determined that, under the circumstances, it would be inappropriate to remove Cheyenne and Leslie from their current stable living situation merely for the purpose of placing them with a relative. Moore's second and eighth assignments of error are overruled, as are Edwards second and third assignments of error.
 F. Evidentiary Decisions
"The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. The judgment of the trial court will be reversed only if the reviewing court finds that the trial court clearly abused its discretion by excluding the proffered evidence, and that the exclusion materially prejudiced the complaining party. State v. Hymore (1967), 9 Ohio St.2d 122,128, certiorari denied (1968), 390 U.S. 1024,20 L.Ed.2d 281. To find an abuse of discretion, the reviewing court must find that the trial court's actions were "unreasonable, arbitrary, or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157. Material prejudice exists when, after weighing the prejudicial effect of the errors, the reviewing court is unable to find that without the errors the fact finder would probably have reached the same decision. Cf. Hallworth v.Republic Steel Corp. (1950), 153 Ohio St. 349, paragraph three of the syllabus.
Moore has argued that the decisions that the trial court made about numerous evidentiary matters were an abuse of discretion.[11] Initially we note that of the sixteen decisions complained about, only seven[12] of the decisions are evidentiary, the other nine errors are not properly before the court as part of this assignment of error.[13] The decisions which are encompassed by this assignment of error are (1) quashing Moore's subpoena to the executive director of CSB; (2) permitting inconsistent access to notes used by witnesses during testimony; (3) limiting the scope of the April 1998 hearing to information obtained or events occurring after the November 1997 trial and inconsistent decisions regarding introduction of evidence pertaining to the pre-1997 trial; (4) permitting inconsistent questioning of witnesses about an exhibit of approximately sixty letters; (5) excluding the testimony of Kris Traub; (6) taking judicial notice of prior juvenile court proceedings involving the parties.
To reverse the judgment of the trial court because of evidentiary decisions, the decision must have been erroneous. In addition, that error must have caused prejudice. In other words it must make it improbable that, absent the error, the court would have reached the same result.
1. Quashing the Subpoena to the Executive Director of CSB
Moore subpoenaed Joe White, the Executive Director of CSB, to testify regarding "the policies of CSB both as to what is in the best interest of a minor child as well as visitation policies, and also to help elaborate on the issue of whether or not CSB acted in good faith throughout these proceedings[.]" CSB moved to quash the subpoena, asserting that requiring White to testify would place an undue burden on both CSB and on White. As required by Civ.R. 45(C) (4) CSB attached an affidavit attesting to the fact that it had attempted to resolve the matter directly and that it had offered the testimony of Andrea Porter, the Director of Social Services. Moore did not respond with a demonstration of "substantial need for the testimony or material that cannot be otherwise met without undue hardship[.]" Civ.R. 45(C) (5). Under these circumstances, quashing the subpoena to White was proper.
2. Access to Witness Notes
During the cross examination questioning of CSB worker Danielle Bernard, Bernard referred to notes to help her recall two specific dates. Moore's counsel asked, "Was she referring to these notes during her direct examination by the prosecutor? * * * I couldn't see that she was reading off her notes." (Emphasis added.) The court indicated that it didn't think she had been, and Bernard responded that she had not been. Moore has not provided any legal authority for the proposition that after cross examination has begun she is entitled to review notes that were held, but not reviewed, during direct examination.
In addition, the circumstances are different from the incident in which Moore contends she was treated unfairly. The State objected to the witness "looking down at notes and going through just reading off her notes[.]" The State was then permitted to review the witnesses' notes. In that instance, the State observed the witness reading from her notes, the witness did not deny it, and the objection and the request to review the notes were immediate. In the incident Moore has complained of, Moore did not see the witness reviewing her notes during direct testimony, and waited until cross examination to request a review of the notes. When the notes were requested, both the court and the witness said that the witness had not been reading from her notes during direct examination. The trial court's decision in this matter was not unreasonable, arbitrary, or unconscionable.
3. Scope of April 1998 Hearing and Prior Event Rulings
Moore has complained that it was prejudicial to limit the scope of the April 1998 hearing to events after November 1997. In addition, she has complained that the State was permitted to introduce evidence regarding events that occurred before November 1997, but that she was not. The trial court accepted the magistrate's decision that Cheyenne and Leslie could not be placed with either parent within a reasonable period of time or should not be placed with either parent. It properly rejected the magistrate's decision that long term foster care was in the best interests of the children because the dispositional statute made that option unavailable. The April hearing was conducted primarily for the purpose of determining what placement was in the best interests of the children. As noted earlier, that determination is predominately forward looking. Given that the children are where they are, the trial court's job was to determine whether it was in the best interest of Cheyenne and Leslie to grant permanent custody to CSB.
In the November hearing, following off the record discussions with the magistrate, Moore and Edwards decided to cut short the presentation of their case on the understanding that the magistrate would recommend long term foster care. In addition to gathering evidence about the best interests of the children, the trial court permitted Moore and Edwards to put on virtually their entire case during the April hearing, including an extensive exploration of the events that occurred or were known about before the November hearing. The bulk of the testimony from the seven witnesses was primarily about events that occurred before November 1997. The greater part of the transcript contains the testimony of these witnesses. In contrast, for those witnesses whose November 1997 testimony ended prior to the parties' consultation with the magistrate, the trial court generally limited cross examination to events that occurred after the November hearing. Exceptions were made when an occasional new allegation regarding the pre-November period was made, in which case Moore and Edwards were permitted to cross examine the witness who made the new allegation.
Moore and Edwards were entitled to put forward one complete defense. Although it would perhaps have been better for them not to have cut short their November defense, their decision to do so was understandable given the expressed intent of the magistrate to deny CSB's motion for permanent custody. Even so, when the trial judge reviewed and rejected the magistrate's decision, Moore and Edwards were permitted to examine all the witnesses they would have called in the November hearing about events that occurred before November 1997. In addition, they were permitted to question all witnesses about the period since November 1997 and about newly introduced evidence about the period before November 1997 that was relevant to the determination of the children's best interests.
The list of transcript page numbers that Moore provided to illustrate what she believed to be prejudicial limitations on the presentation of her case instead demonstrated that the trial judge, under difficult circumstances, adhered to the guidelines she had articulated to the parties. The limitations complained of were on the testimony of witnesses who had completely testified at the November hearing, on questions that were designed to elicit cumulative testimony, and on broadly worded questions or off topic questions. It was not unreasonable, arbitrary, or unconscionable for the trial court to select the limitations it did. Those limitations, once selected, were not arbitrarily, unreasonably, or unconscionably enforced.
4. Testimony about Multi-Document Exhibit
Moore also complained about disparate treatment with respect to testimony about some sixty letters she wrote during her incarceration, and medical records of the children for the two years prior to incarceration. All, or almost all, of the letters were admitted into evidence during the November hearing. Moore's attorney wanted to review "each exhibit with her individually and each doctor's visit with her individually." Moore's attorney did not specifically articulate how he hoped this exploration "that would take a lot of time to do" would aid in establishing her case. He did indicate that his proposed stipulation, in lieu of detailed questioning, would have included establishing the "numerous requests on behalf of mother for visitations[,] maintaining a bond between child and mother, as well as also demonstrating a commitment on mother's behalf toward her children." The letters were part of the trial record. Moore did not proffer any reason as to why testimony about the letters would present new information not contained in the letters themselves. The trial court's decision to permit the documents to speak for themselves and to avoid the introduction of cumulative evidence was not unreasonable, arbitrary, or unconscionable.
Again, the circumstances surrounding the questioning of Moore by the State about three of the letters were very different. The State was pursuing a line of questioning relevant to Moore's relationship with Edwards. Two of the letters expressed concern that Edwards had threatened to kill her, that she was afraid that things would get worse when Edwards got out of jail, and that Edwards needed to have counseling and treatment before he had contact with Cheyenne and Leslie. The third indicated that Moore wanted Edwards to have custody of the girls. Eliciting an explanation of Moore's change in attitude towards Edwards, as it is reflected in those three letters, was not cumulative and was relevant to the inquiry of whether Moore could make decisions that were in the best interests of her children and which would ensure that her children were not left without adequate parental care in the future.
5. Exclusion of Testimony of Kris Traub
Moore has asserted that it was an abuse of discretion to exclude the testimony of Kris Traub. Traub is an unrelated party who lived next door to the Smiths, the primary residence of Cheyenne and Leslie when they were in the legal custody of their grandmother. Traub attempted to get help for the girls repeatedly, and eventually their grandmother called her and asked her to come get the kids. She did so, and found Leslie in urine soaked pants with "thick packing tape like duct tape width, but clear packing tape, wrapped around and around her diaper" with "huge blisters and * * * old blood marks from the blisters bleeding that would just run down all the way to her ankles." On the way to her home, Traub stopped for food and Cheyenne ate four foot-long hot dogs and all the juice she could get her hands on; Leslie drank six bottles of milk and formula and was actively fighting with Cheyenne and with Traub's nephew for their food.
The tragic experiences of these children, as described by Traub, do not support Moore's quest to get her children back. The trial court determined that Moore, by voluntarily participating in the sale of drugs, put herself in the position of being unable to provide adequate parental care for her children. That they were severely abused while she was unable to protect them is strong support for finding that the "seriousness * * * or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety." This is particularly true, given that she has had very limited success at being unable to stay away from addictive substances and out of trouble with the law while not incarcerated.
The proffered testimony, although it more explicitly described some of the abuse suffered by these children than other evidence, did not provide any essentially new information. It was not an abuse of discretion to exclude it. In addition, even if excluding it was an abuse of discretion, if admitted it would have supported the state's position that the neglect suffered by Cheyenne and Leslie was extreme. This is a portion of what the State needed to establish in order to find that the children could not be placed with Moore within a reasonable period of time or should not be placed with her. It is unlikely that, had this evidence been introduced, the trial court would have reached a different conclusion.
6. Judicial Notice of Distinct Cases
Moore is correct that the trial court improperly took judicial notice of prior, separate court proceedings involving the same parties. Burke v. McKee (1928), 30 Ohio App. 236, 238. The issue was initially raised in the November hearing, when the magistrate also improperly took notice of the 1995 case that terminated when legal custody was granted to the children's grandmother. When the error was brought to the attention of the magistrate, the judgments from the 1995 proceedings were properly made part of the record. The record in the hearing before the magistrate is part of the record in this case. Even though it was not proper to take judicial notice of the prior custody proceedings, the court properly considered the judgments because they were made part of the record in this case. No prejudice resulted from the error.
 G. Ineffective Assistance of Counsel
Moore has argued that her counsel was ineffective because he "prematurely rest[ed] mother's defense at the November 1997 permanent custody trial without calling 13 subpoenaed defense witnesses (including Kris Traub) on her behalf." Moore rested her defense based on the indication by the magistrate that she would deny the permanent custody request, which the magistrate subsequently did. Moore has asserted that "the trial judge refused to allow these 13 witnesses to testify at the April 1998 permanent custody trial concerning any matters that pre-dated the November 1997 trial[.]"
The exclusion of Traub's testimony was addressed above. Because we have determined that, even if erroneously excluded, the testimony proffered would not have changed the outcome of the trial there was no prejudice in its exclusion. Absent prejudice, the decision of a trial court will not be reversed for ineffective assistance of counsel.
Moore did not present evidence that the exclusion of the remaining witnesses resulted from the decision of her attorney to rest "prematurely," did not proffer their testimony, and did not demonstrate how such testimony would have been helpful to her case. The record includes thirteen subpoenas for the November 1997 hearing. Of those thirteen, six actually testified at the November hearing. Six of the subpoenas were reissued for the April hearing, including to three to individuals who had testified in the November hearing. All the individuals to whom the April subpoenas were issued actually testified. Moore has not asserted that she was forbidden to subpoena the remaining seven witnesses from the November hearing. Aside from Kristin Traub, Moore has not pointed to any portion of the record in which she was prohibited from offering the testimony of the any witnesses who were available and ready to testify at the November hearing and who were under subpoena for the April hearing. She has not proffered the testimony of these potential witnesses, nor has she demonstrated how their testimony would have been helpful to her case.
The transcript from the April hearing does contain approximately three hundred seventy pages of defense testimony from seven witnesses. The vast majority of the testimony pertains to matters that predated the November 1997 hearing. Even if the actions of the attorney resulted in the exclusion of the testimony of some additional witnesses, Moore was permitted to call witnesses and present testimony from matters predating the November 1997 hearing. It is clear that there was substantial testimony regarding the pre-November period. Even if her attorney's decision to rest "prematurely" was erroneous, Moore has not demonstrated that the additional testimony of these witnesses would have made the same result improbable.
Moore has not established that the actions of her attorney were prejudicially ineffective. Because of this, her thirteenth assignment of error is overruled.
 III
Although the failure to appoint counsel during earlier proceedings was likely improper, Moore's failure to appeal the judgments arising out of those proceedings waived her right to appeal that error, and her first assignment of error is overruled. Her second assignment of error is overruled because the trial court properly rejected the magistrate's decision regarding long term foster care because the relevant statute did not support it. The decision of the trial court to conduct its own evidentiary hearing was not an abuse of discretion so Moore's third assignment of error is overruled. Moore's fourteenth assignment of error is overruled because she has incorrectly interpreted the judgment of the trial court. Because Moore and Edwards did not challenge the specific findings made by the trial court, which made mandatory the ultimate finding that placement of the children with them was inappropriate, Moore's fourth and fifth assignments of error and Edwards' first assignment of error are overruled. Moore's seventh assignment of error is overruled because the finding of reasonable efforts at reunification were made during the initial adjudication and disposition of her children, and under the statute it is not required to be made at a secondary motion for permanent custody. The finding that it was in the best interests of the children that permanent custody be granted to CSB was proper, even though the guardian ad litem recommended that temporary custody be extended and there were relatives who were willing to provide a home to Cheyenne and Leslie. Moore's sixth, eighth, and eleventh assignments of error and Edwards' second and third assignments of error are overruled. Because the trial court's evidentiary rulings were reasonable, and well within the discretion granted to it, Moore's ninth, tenth, and twelfth assignments of error are overruled. Moore's thirteenth assignment of error is overruled because her counsel was not constitutionally ineffective.
Having considered and overruled all seventeen of the assignments of error raised by Moore and Edwards, the judgment of the trial court is affirmed.
Judgment affirmed.
 KK The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
 WILLIAM R. BAIRD FOR THE COURT WHITMORE, J.
BATCHELDER, J.
CONCUR
[1] The first three assignments of error correspond to Moore's first three assignments of error. The fourth corresponds to Moore's fourteenth assignment of error. The fifth assignment of error encompasses Moore's fourth through eighth and eleventh assignments of error and all three of Edward's assignments of error. The sixth assignment of error includes Moore's ninth, tenth and twelfth assignments of error. The final, unnumbered, assignment of error corresponds to Moore's thirteenth assignment of error.
[2] Because she was still in diapers at the time, changing the diaper required touching around her private areas.
[3] Psychologist Meryl Orlando reported that, "Cheyenne Moore certainly has knowledge about sexual matters not typical for a child her age. However, it is clear that her inappropriate or abusive sexual experiences predated her knowing Bill or Julie Markle."
[4] In State ex rel. Heller v. Miller (1980), 61 Ohio St.2d 6, paragraph two of the syllabus, the Supreme Court of Ohio held that when the state initiates an action to permanently terminate parental rights a parent is entitled, under both the United States and Ohio constitutions, to appointed counsel. Subsequently, the United States Supreme Court determined that the United States constitution does not universally guarantee indigent parents the right to counsel at termination proceedings. Lassiter v. DurhamCty. Dept. of Social Serv. (1981), 452 U.S. 18, 33, 68 L.Ed. 640,654. Since then, the Ohio Supreme Court has described the right to counsel as a statutory right "that goes beyond constitutional requirements," without specifically overruling Heller. State exrel. Asberry v. Payne (1998), 82 Ohio St.3d 44, 46.
[5] Under extremely rare circumstances, a constitutional violation might result in a custody judgment that is void. In that event a judgment which, on its face appears valid and final, may be challenged outside the window for appeal. See Howard v.Catholic Social Serv. of Cuyahoga Cty., Inc. (1994), 70 Ohio St.3d 141,144-146. Those circumstances do not exist here.
[6] The case involves dependency and neglect charges against the Smiths with respect to their own children. The Smiths were Leslie's and Cheyenne's unofficial caregivers for much of the time they were in the legal custody of their grandmother.
[7] See the discussion supra at page.
[8] Although Moore did not specifically argue that the court should not have found that the tenth factor applied to her, in the interests of justice we have reviewed the evidence and have determined that the finding is supported by clear and convincing evidence.
[9] Although not specifically argued, as required by App.R. 16(A) (7), in the interest of justice we have reviewed the evidence, and find that the conclusion is clearly and convincingly supported by it.
[10] In 1991, Moore was convicted of receiving stolen property and forgery, for which she received a two year suspended sentence, and two years probation. On July 21, 1992 she was found guilty of violating her probation, for which she was ordered to "re-enter and successfully complete the Community Based Correctional Facility operated by the Oriana House[.]" In November 1992 she was again found guilty of violating her probation, and a re-evaluation for placement in Oriana House was ordered. In September 1993, Moore was again found guilty of violating probation, and an additional year was added to her probation period. Also in September 1993, Moore was found guilty of deception to obtain a dangerous drug, and sentenced to a year in prison. That sentence was suspended. In January 1994, Moore's probation was extended for a period of one year so she could pay the balance of monetary obligations in the case, and she was ordered to perform eighty hours of community service in lieu of court costs. In January 1995 it was also extended for six months for her to complete her community service obligations. Finally, in July 1995 Moore's probation was extended for 90 days in order to permit her "pay the balance of monetary obligations owed in this case. Her probation ended on September 19, 1995. Two days later, she was convicted of the trafficking charges that resulted in incarceration, and on February 26, 1996, was convicted of the aggravated assault charges for which a consecutive sentence was imposed.
[11] Moore has also asserted that these errors deprived her of her due process right to be "judged by an impartial body." The cases cited in support of this proposition involved clear judicial statements indicating that the trial judge was not impartial with respect to the criminal defendant whose trial was pending at the time the statements were made. Moore has not alleged any such conduct here.
[12] For ease of review, two of the evidentiary decisions are discussed together below as decision number three.
[13] The assignment of error consists primarily a listing of the sixteen decisions asserted to be erroneous. The accompanying one paragraph "argument" is conclusory, at best. This court has an obligation to address all errors assigned and properly argued. See App.R. 12(A). These nine additional decisions which Moore has asserted are erroneous were neither properly assigned nor properly argued.